**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**SOUTHERN DIVISION**

| | |
|---|---|
| JADE MCCLEAN, | ) |
| | ) |
| and | ) |
| | ) |
| JAMIE DAVIS, | ) |
| | ) |
| Plaintiffs, | ) Cause No. 6:11-cv-03037-DGK |
| | ) |
| v. | ) |
| | ) |
| HEALTH SYSTEMS, INC. , | ) |
| | ) |
| FORSYTH MANOR, INC., | ) |
| | ) |
| Defendants. | ) |

**DEFENDANT HEALTH SYSTEMS, INC. AND DEFENDANT FORSYTH**
**MANOR INC.'S LEGAL MEMORANDUM IN OPPOSITION TO PLAINTIFFS'**
**MOTION FOR CONDITIONAL CERTIFICATION**

COME NOW Defendant Health Systems, Inc. and Defendant Forsyth Manor, Inc., by and through their undersigned counsel, and for their Legal Memorandum in Opposition to Plaintiffs' Motion for Conditional Certification in the above-captioned cause of action, states as follows:

A. Factual overview of the relationship between Health Systems and its managed facilities

Defendant Health Systems, Inc. provides management and consulting services to various nursing and rehabilitation facilities located at geographically dispersed locations throughout the State of Missouri. Doc. 127-3 at p.5 of 35 (p.17 of the deposition). Presently, Defendant Health Systems, Inc. manages sixty (60) such facilities, including Defendant Forsyth Manor, Inc. Doc. 127-3 at p.5 of 35 (p.17 of the deposition). Defendant Health Systems, Inc. is located in Osage Beach, Missouri and has

approximately fifty (50) of its own employees. Doc. 127-3 at p.4 of 35 (p.15 of the deposition).

Defendant Health Systems, Inc. provides its management and consulting services pursuant to a certain Management Agreement. Doc. 127-3 at p.3 of 35 (p.10 of the deposition), and at p.7 of 35 (p.27-28 of the deposition), and Ex. 3 thereto[1]. Pursuant to its role as a consultant, Defendant Health Systems, Inc. will periodically send employees known as Qualify Assurance Nurses to its managed facilities to provide clinical support such as providing training to staff on quality assurance issues. Doc. 127-3 at p.4 of 25 (p.16 of the deposition). Additionally, and also pursuant to its role as a consultant, Defendant Health Systems, Inc. will send an employee known as a Director of Operations to its managed facilities to provide financial and administrative consulting on issues such as budgeting, Medicare/Medicaid reimbursement, etc. Doc. 127-3 at p.4 of 25 (p.16 of the deposition).

Moreover, the managed facilities will occasionally consult with Diana Atkin on questions regarding human resources issues, or to request sample policies for use in their facilities. D. Atkin depo (**Ex. 2**) at p. 16.

At any given time, there will be approximately 3,500 individuals who are employed at all of the facilities managed by Defendant Health Systems, Inc. D. Atkin depo. (Ex. 2) at p.46. Moreover, the turnover in this industry is generally high and on an average year there will be between 125%-150% turnover (i.e. between 4,375 – 5,250 employees will work at all of the managed facilities in a given year). *Id.* at p.54.

Importantly, however, no employees of Defendant Health Systems, Inc. work at

---

[1] Exhibit 3 to the deposition of B. Scott Hinkle was not attached to Plaintiffs' Doc. 127-3, so Defendants will attach it as a separate **Exhibit 1** hereto.

its managed facilities on a daily basis. D. Atkin depo. (Ex. 2) at p.124. Rather, its on-site management and consultation services typically occur approximately once per month. D. Atkin depo. (Ex. 2) at p.127. *See also* deposition of Jaynie Dennis (**Ex. 3**) at p.35 (Q. How frequently would these in-services occur? A. Maybe once a month. Sometimes we would go two or three months and not have one.").

Diana Atkin testified about the lack of daily oversight of the managed facilities as follows:

Q. All right. On a daily basis, are there any Health Systems Inc. employees at the managed facilities?
A. Not on a daily basis, no.
Q. On a daily basis, do any Health Systems Inc employees supervise the hourly employees at Health Systems Inc-managed facilities?
A. No, they do not.
Q. They don't direct those hourly employees' work conditions?
A. No.
Q. They don't discipline those employees?
A. No.
Q. All right. You talked a little bit about how Health Systems Inc. will offer various recommendations to the facilities. Do you recall that?
A. Yes.
Q. Are the facilities required to accept those recommendations?
A. No.
   . . . .
Q. All right. And in the past three years, can you recall instances in which the facilities, in fact, did not follow your recommendation?
A. Certainly.
   . . . .
Q. At the end of the day at each managed facility, is the administrator the one that has the authority to interpret the Health Systems policies?
A. Yes, they do.

D. Atkin deposition (Ex. 2) at p.135-36; 145.

Rather, employees at the various managed facilities receive their supervision, oversight and training by employees of the individual facilities on a daily basis. For instance, employees such as Plaintiffs McClean and Davis work in a job capacity which

is commonly referred to as a CNA (i.e. Certified Nursing Assistants). Doc. 127-3 at p.30 of 35 (p.120 of the deposition). The CNAs report to a Charge Nurse, which is typically a Registered Nurse (i.e. RN) or a Licensed Practical Nurse (i.e. LPN) who oversees the daily operation of the staff that is in charge of resident care activities. Doc. 127-3 at p.31 of 35 (p.122-123 of the deposition). The Charge Nurses are employed by the particular managed facility, and is typically the highest ranking employee who is on a particular shift. *Id*.

The Charge Nurse reports to an Assistant Director of Nursing (i.e. ADON) or a Director of Nursing (i.e. DON), depending on the number of residents at a particular facility. *Id*. The ADON and DON are also employees of the managed facility. *Id*. Although the ADON/DON are not typically on the floor performing direct patient care related activities, they are physically located in an office at the managed facilities on a daily basis. The DON reports to the Administrator, who is the highest raking employee at each managed facility. *Id*. Each managed facility does its own hiring and firing. Atkin depo (Ex. 2) at p.93. Personnel files are also kept at the individual facilities. D. Atkin depo. (Ex. 2) at p.133.

It is also significant that interpretation and application of daily operating policies and procedures is necessarily something that occurs at the facility level. Doc. 127-3 at p.32 of 35 (p.127-28 of the deposition). Indeed, Mr. Hinkle testified that he has personally observed different managers at different facilities interpret and apply policies differently. *Id*. For instance, in the event that an employee incurs a "no-call, no-show" (i.e. they did not show up for a shift and also did not call to inform the facility that they would not be there), then the default policy is that it is an immediately terminable

offense. Doc. 127-4 at p.21 of 40. However, due to problems with hiring a sufficient level of staff at rural facilities, Mr. Hinkle has witnessed instances in which a particular individual will have several "no-call, no-show" incidents without being terminated. Doc. 127-3 at p.32 of 35 (p.128 of the deposition).

Additionally, management at each individual facility was responsible for scheduling the employees and determining the hours that they worked. Deposition of Jaynie Dennis (Ex. 3) at p.59 ("Q. Who determined what hours you worked, like who did your schedule? A. DON. Q. Okay. And that's a Grand River employee? A. The director of nursing, yes.").

Moreover, even the procedures for reporting a missed meal break may vary from facility-to-facility, or even from department-to-department within each given facility. For instance, Mr. Hinkle testified that he has seen some facilities which have developed a form that the employees fill out to report a missed meal break which is then submitted to the office administrator at the facility in order to manually add the time to their pay records. Doc. 127-3 at p.33 of 35 (p.131-32 of the deposition). Mr. Hinkle also testified that he has observed other facilities in which the method of reporting a missed meal break is more informal such that the employee will simply orally inform their supervisor of the missed meal break. *Id*.

Diana Atkin also testified about the disparities in methods that individual facilities will use in order to report a missed meal break as follows:

> Q.      . . . Is it your understanding that the different Health Systems-managed facilities have different procedures for reporting when a meal break is missed or interrupted.
> A.      Yes, that's my understanding.
> Q.      Do you have any understanding as to the various ways in which they handle that situation?

5

A.     Some of the homes, I think, are more formal than others. They have an actual sign-in sheet where, you know, it's at the nurses' desk, and you write it in and you note what you have. And your charge nurse or whoever is the supervisor signs off on it.

Other homes are much more informal, where the employee just, you know, slips a note to the bookkeeper that says, "Hey, I missed my lunch."

The bookkeeper verifies with whoever the supervisor is, and then that process is, you know – and then it gets sent in to payroll from that method. And I also think that we have various facilities that monitor vary carefully to make sure that meal breaks are not missed. You know, that you get your 30 minutes.

D. Atkin depo (Ex. 2) at p.139-40.

The fact that each managed facility is, in operation, its own separate and distinct operation becomes evident when Plaintiffs and the opt-ins testified about where they worked. When asked this question, each witness identified the specific facility where they worked on a daily basis. Jaynie Dennis deposition (Ex. 3) at p.23[2]; Belinda Bledsoe deposition (**Ex. 4**) at p.15[3]; Veronica Alacantar deposition (**Ex. 5**) at p.13-14 (same); Arthur McKinnon deposition at p.15 (same)(**Ex. 6**); Kathryn McKinnon deposition (**Ex.7**) at p.7 (same); Tammy Belt deposition (**Ex. 8**) at p.16 (same); Jamie Davis deposition (Ex. 9) at p.20. Not a single witness testified that they worked for Defendant Health Systems, Inc. *Id*.

---

[2]     Q.     Back in 2008 and 2009, if someone would have asked you, "Where do you work?" what would you have told them?
A.     Grand River Health Center.
Q.     And not Health Systems?
A.     No.

[3]     Q.     All right. If someone would have asked you in 2009, all the way up until April of 2011, you know, where you work, what would you have told them?
A.     Oak Grove Nursing Facility and Rehab.
Q.     Have you ever told anyone that you worked for Health Systems?
A.     *No sir, because I didn't know that I had.*

Emphasis added.

As a practical matter, this makes sense. Daily operating decisions occur via the decisions of the individual managers who oversee the class members on a daily basis. The simple fact that Defendant Health Systems, Inc. provides consulting services to each facility does not, and cannot, transform it into these employees *de facto* employer. Such an overbroad interpretation of the employment concept would frustrate the Congressional intent of limiting liability under the FLSA only to those employers who truly make the daily operating decisions as to whether to compensate employees for all hours that they work.

\* \* \* \*

Additionally, one of the grounds on which Plaintiffs seek conditional certification is for uncompensated time spent in training sessions commonly known as "in-service". However, the manner in which the managed facilities ensure that employees are properly compensated for this time again varies from location to location, and even from one Administrator to the next.

For instance, Plaintiffs McClean and Davis worked at the Forsyth Manor, Inc. facility and while this facility was under the supervision of a previous Administrator, the employees would actually clock in and clock out for their in-service training and were therefore compensated for this time. Doc. 127-3 at p.34 of 35 (p.135-36 of the deposition). However, when Arlen Davidson became Administrator at Defendant Forsyth Manor, Inc. he decided to change the policy because he believed that employees were being over compensated because the in-service would generally not begin for a measurable amount of time after the employees had already clocked-in. *Id.* Thus, Mr. Davidson implemented a system whereby employees who attended the in-service training

would sign their names on a sign-in sheet, and he would keep tract of how long the in-service meeting lasted and then have the office administrator manually add the amount of time spent in the in-service to these employees' time records. *Id.*

The majority of the Health Systems, Inc. managed facilities utilized a "clock-in, clock-out" method of ensuring that its employees were properly compensated for in-service training sessions. D. Atkin depo (Ex. 2) at p.129. To wit:

> Q. Okay. All right. If you weren't working on the 25th and you had to come in for in-service, would you like clock in and clock out?
> A. Yes, sir.
> . . . .
> Q. All right. So if you clocked in and clocked out, you got paid for that time that you spent in in-service; correct?
> A. Yes, sir.

Kimberly Plakorus depo (**Ex. 10**) at p.21 (Ms. Plakorus worked at the West Village Manor facility – Ex. 10 at p.9).

> Q. All right. I've heard testimony in some of these depositions that some facilities would have employees like clock in and clock out when they came in for in-service. Is that how it worked at California?
> A. Yes.
> . . . .
> Q. Okay. So of course, if you clock in and clock out for in-service, you're getting paid for that time?
> A. Yes.

Veronica Alcantar depo (Ex. 5) at p.23-24 (Ms. Alacantar worked at the California Care facility – Ex. 5 at p.9).

> Q. All right. So when you came in for in-service, you know, on your day off, you would clock in and clock out?
> A. Yes.
> Q. So you got paid for that time?
> A. Yes.

Tammy Belt deposition (Ex. 8) at p.19 (Ms. Belt worked at the California Care facility – Ex.8 at p.8).

> Q. Let's switch over to Mary's Manor. Do you clock in and clock out for in-service at Mary's Manor?
>
> A. Yes, we do.
>
> Q. All right. So you get paid for that time?
>
> A. Yes, we do.

Katherine Rich deposition (**Ex. 11**) at p.20-21.

*See also* **Exhibits 12 - 29** in which eighteen (18) total employees from Defendant Health Systems, Inc.'s Sunset Home, Moberly Nursing & Rehab, Mark Twain Caring Center, and Point Lookout Nursing & Rehab facilities have submitted evidence that they clocked in and out for in-service meetings.

## B. Legal argument

1. Given that the parties requested, were granted, and have conduced discovery, it is inappropriate to utilized the "two-step" analysis to conditional certification; rather, a heightened standard more akin to the second step of conditional certification is appropriate

Initially, Defendants agree with Plaintiffs' assertion that the Eighth Circuit has yet to provide any guidance to determine whether the named Plaintiffs are "similarly situated" with members of their proposed class so as to facilitate notice to the class pursuant to 29 U.S.C. § 216(b). In the absence of such guidance, this Court retains discretion to determine whether it will conditionally certify a collective action, and such power should only be authorized in "appropriate cases". *Loyd v. Ace Logistics, LLC*, 2008 WL 5211022 at * 2 (W.D. Mo. 2008).

Moreover, there is no question that Plaintiffs bear the burden of establishing that they are similarly situated to members of their proposed class. *Young v. Cerner Corp.*, 503 F.Supp.2d 1226, 1229 (W.D. Mo. 2007)("The burden is on plaintiffs to demonstrate that they and the potential opt-in plaintiffs are substantially similar).

Although some Missouri District Courts have utilized the "two-step" approach to

analyze whether the claims of potential opt-in plaintiffs are similarly situated to those of the named plaintiffs, the procedural context of these cases has been nearly uniformly prior to the parties conducting discovery. *See*, *e.g.*, *Davis v. Novastar Mortgage, Inc.*, 408 F.Supp.2d 811, 815 (W.D. Mo. 2006)("First, plaintiff moves for certification at an early stage in the litigation . . ."); *Lloyd*, 2008 WL 5211022 at * 2 ("Because the court has minimal evidence, this determination is made using a fairly lenient standard . . ."). Indeed, Plaintiffs even concede in their Brief that "district courts will make the determination of whether to conditionally certify a class based solely on the affidavits presented by the plaintiffs." Pl. Brief [Doc. 127] at p.9.

This is not a case where Plaintiffs are forced to rely solely upon their Complaint and Affidavits in support of their Motion for Conditional Certification. The parties jointly requested the opportunity to conduct discovery as to the similarly situated issue via the Joint Proposed Scheduling Order and Discovery Plan [Doc. 58 at p.1-2]. The Court granted this request in the Scheduling Order. Doc. 59 at p.1. Thereafter, the parties exchanged Interrogatories and Requests for Production of Documents, and have taken twelve depositions to date (i.e. Plaintiffs deposed B. Scott Hinkle – General Counsel, and Diana Atkin – Human Resources, and Defendants deposed Plaintiffs, and eight (8) opt-in plaintiffs).

Indeed, Plaintiffs rely upon several documents generated by discovery in support of their Motion for Conditional Certification. Doc 127-3 (B. Scott Hinkle deposition); 127-4 (Handbook which was produced in discovery); 127-6 (Plaintiff Jade McClean deposition); 127-7 (Defendant's Response to Plaintiffs' Interrogatories). Under these circumstances, it would be inequitable to allow Plaintiffs to use the documents/testimony

that they generated from discovery as a sword to attack Defendants on the similarly situated issue, but to also allow them to use the "two-step" conditional certification analysis as a shield to prevent Defendants from making a factual showing to the contrary. They cannot have it both ways.

Other courts have acknowledged the fundamental unfairness in the "two-step" approach when the parties have engaged in discovery, and therefore have utilized an intermediate approach under these circumstances. Perhaps the most eloquent articulation of this heightened standard came from Judge Zack Zouhary from the United States District Court for the Northern District of Ohio in the very recent case of *Creely v. HCR Manorcare, Inc.*, 2011 WL 2259132 (N.D. Ohio 2011) as follows:

> However, in order to provide some measurable standard by which to judge if Plaintiffs have made a sufficient modest "plus" factual showing, and *to prevent the* **absurd** *result of granting the parties time to do discovery on the conditional certification question but subsequently imposing no incremental hurdle in determining whether Plaintiffs may send opt-in notices*, this Court will compare Plaintiffs' allegations set forth in their Complaint with the factual record assembled through discovery to determine whether Plaintiffs have made sufficient showing beyond their original allegations that would tend to make it more likely that a class of similarly situated employees exists. In other words, the Court will review whether Plaintiffs have advanced the ball down the field—showing that it is more likely that a group of similarly situated individuals may be uncovered by soliciting opt-in plaintiffs. And, because the Court will continue to use a lenient standard, Plaintiffs need not have moved the ball far down the field, but they need to have shown some progress as a result of the discovery as measured against the original allegations and defenses.
>
> . . . it is certainly no surprise to Plaintiffs that when this Court specifically grants the parties time for the purpose of conducting limited discovery, that this Court will require Plaintiffs to make some small showing that advances their claims and pushes the proverbial ball down the field. *If there was no expectation of advancing Plaintiffs claims, the entire exercise of limited discovery would be meaningless*.

*Id*. at * 7-8 (emphasis added).

Moreover, District Courts in Missouri have explicitly acknowledged that some

Courts have rejected the "two-step" approach in favor of a more stringent evidentiary standard, but found that a heightened standard was inappropriate due to the absence of discovery. *Graham v. Town & Country Disposal of Western Missouri, Inc.*, 2010 WL 5173181 at * 2 (W.D. Mo. 2010)("In some cases, the Court will skip the "notice" step and move directly to a second-step evaluation . . . [i]n the instant case, the parties have not yet conducted discovery, thus the Court finds that Plaintiff's Motion should be evaluated under the more lenient "notice stage" criteria.").

Accordingly, use of the *Creely* "hybrid" standard is the most equitable and appropriate in this case. This intermediate standard does not hold Plaintiffs to the higher "decertification" stage standard which applies after all discovery has been completed, but also requires Plaintiffs to show "something more" to justify the discovery that has been completed to date. As noted by *Creely*, failure to utilize an intermediate standard would mean that the parties' joint request for discovery was meaningless.

* * * *

Plaintiffs seek conditional certification based upon three separate and distinct allegations which purportedly result in class members being denied overtime compensation: (i) auto-deducting for unpaid 30-minute meal periods, (ii) utilizing skewed rounding methods, and (iii) excluding "bonuses" from the employees' regular rate of pay which is used to calculate the overtime compensation which is due to them. Doc. 127 at p.2. Defendants will address each allegation separately *infra*.

2.    Defendant's automatic meal break deduction policy

In general, Defendants oppose Plaintiff's Motion for Conditional Certification on the basis that they have not presented sufficient evidence of a common policy or plan affecting the extremely broad class of plaintiffs that they seek to represent.

Defendants do not dispute that the timekeeping system that they utilize automatically deducts a thirty (30) minute meal break from the time records of its hourly employees who work a shift in excess of six (6) hours. However, it is Defendants' policy that employees are completely relieved from duty during this meal break, and if they are not so relieved then they are either (i) entitled to compensation for the meal break, or (ii) receive an additional break later in their shift to make up for the lost meal break. Specifically, the Personnel Policies and Procedures Manual provides as follows:

> 8.8 Breaks from Work
> . . . .
> > b. Meal break: If you work six (6) hours a shift, you must take a thirty (30) minute unpaid meal break. You must take your unpaid meal break within the first five (5) hours of your shift. Employees should eat in designated areas only. An employee is prohibited from working during the 30 minute unpaid break unless the employee first obtains prior express, written consent from the employee's supervisor. Forms for this consent are available at the nurse's station and the business office. If express written consent is given and the employee's 30 minute meal break is interrupted, shortened or skipped, the employee will be given the option of taking a 30 minute unpaid meal break during the remainder of that shift or receiving an additional 30 minutes of pay. If meal breaks are interrupted, shortened or skipped without prior express, written permission the employee will be paid for the time worked but may be subject to disciplinary action up to and including termination.

Doc 127-4 at p.18 of 40.

Diana Atkin testified that it is Defendant Health System, Inc.'s policy to have its managed facilities comply with this policy, but that implementation of this policy is specific to each individual managed facility:

| | |
|---|---|
| Q. | . . . So I'm wondering what steps were taken to ensure that the meal break policy complies with state and federal law? . . . |
| A. | Well, we've lined out in the employee handbook that – to notify the employee that 30 minutes is taken if they've worked a minimum of six hours. |
| | We've noted to them in the handbook what they need to do it they do not take their 30 minutes or their 30 minutes are interrupted. And so I believe that complies. |
| Q. | Do you know whether or not the employees ultimately are paid if they miss their meal break? |
| A. | I would say yes, they are. But it's – the procedd to do so is individual within each home. |
| | . . . |
| Q. | How at Forsyth Manor do they track when a meal break is missed? |
| A. | I mean I think you would have to ask them individually how they do it, the administrator and the DON. |
| | My understanding is that the bookkeeper is the one who receives that information. And the employee has to tell the bookkeeper that they missed it. |
| | She would then verify with whoever the employee's supervisor was and would submit that to payroll. |

D. Atkin deposition (Ex. 2) at p.69-70; 105-06.

The law is crystal clear that, standing alone, an employer policy providing for automatic deductions for meal breaks does <u>not</u> violate the FLSA. *White v. Baptist Memorial Health Care Corporation*, 2011 WL 1883959 at * 8 (W.D. Ten. 2011); *Fengler v. Crouse Health Foundation*, 595 F.Supp.2d 189, 197 (N.D. NY 2009)("As plaintiffs in this case have acknowledged, the mere existence and implementation of a policy or practice of making automatic deductions for scheduled meal breaks in and of itself does not violate the FLSA."); *Wolkman v. Catholic Health System of Long Island*, 2011 WL 1741905 at * 1 (E.D. NY 2011)("Plaintiffs rightfully concede that Defendants' default timekeeping policies are not per se labor law violations. This is because, standing alone, an employer policy providing automatic deductions for meal breaks does not violate the FLSA.").

14

The fact that Defendants maintained a formal policy to compensate its employees for all hours worked during meal breaks, or to actually provide a full, uninterrupted meal break, is significant. Under these circumstances, in order to be entitled to conditional certification a plaintiff must prove that the employer utilized a common or uniform practice to refrain from following its formal, written policy. *Frye v. Baptist Memorial Hospital, Inc.*, 2010 WL 3862591 at * 5 (W.D. Tenn. 2010). As one court from within the Eighth Circuit has explained, the lead plaintiff must show that the enforcement of the automatic deduction policy created a "policy-to-violate-the-policy". *Saleen v. Waste Management, Inc.*, 649 F.Supp.2d 937 (D. Minn. 2009). The *Saleen* articulated this concept as follows:

> Of course, the mere fact that some employees of a large corporation were not properly compensated under the FLSA does not provide a "colorable basis" to infer the existence of an unlawful companywide policy. In any large corporation, mistakes are going to be made. Innocent human error-such as computation mistakes, or records being accidentally misplaced-will inevitably result in some employees being underpaid. Moreover, in any large corporation, there are going to be local managers who are ignorant of corporate policies, or who misunderstand corporate policies, or who intentionally violate corporate policies in order to make their own performance look better. Thus the mere fact that a small fraction of employees allege that they did not receive the compensation to which they were entitled provides almost no evidence that the *reason* that these employees were underpaid was because of an unlawful companywide policy.

*Id*. at 941 (emphasis in original).

In this regard, it is important to note that the plaintiffs repeatedly testified that they lack any personal knowledge about the policies for compensating employees for missed meal breaks at any facilities at which they were not personally employed. Jaynie Dennis depo. (Ex. 3) at p. 60 ("Q. So you wouldn't know – you wouldn't have any personal knowledge as to whether or not employees at all these other facilities actually get to take their meal breaks, would you? A. No, sir."); Belinda Bledsoe depo. (Ex. 4) at

p. 46-47 ("Q. You don't have any personal knowledge whether or not employees at all of those other facilities that are affiliated with Health Systems, if they missed their breaks as well, do you? A. No, I'm not aware."); Kimberly Plakorus depo. (Ex. 10) at p.32 (same); Veronica Alcantar depo. (Ex. 5) at p.35 (same); Arthur McKinnon depo. (Ex. 6) at p.29-30 (same); Kathryn McKinnon depo. (Ex. 7) at p.20 (same); Katherine Rich depo. (Ex. 11) p.25 (same).

Several courts have denied conditional certification in cases involving remarkably similar allegations. For instance, in *Saleen v. Waste Management, Inc.*, 649 F.Supp.2d 937 (D. Minn. 2009) the plaintiffs were drivers for a trash hauling company who alleged that they were not compensated for overtime pay as a result of an automatic 30-minute meal break deduction policy. The plaintiffs admitted that the employer had a process for workers to reverse their meal break deduction on days when they worked through lunch, but they alleged that the employer maintained an unwritten policy to discourage and to refuse to honor these reversal requests. Plaintiffs sought certification of a class of all drivers and ride-along loaders (some unionized, some not) who received automatic lunch deductions without confirmation by the employer that they took their breaks. According to the employer, the proposed class consists of between 20,000 and 30,000 employees.

In support of their assertions, plaintiffs provided evidence from 112 declarants and a number of deponents indicating that these individuals and their coworkers were pressured to work through meal breaks, were closely tracked by management as they worked their routes, and were not compensated when they worked through meal breaks. Plaintiffs pointed out that these declarants and deponents represented 71 WMI facilities in 24 states out of a total of, at most, 820 facilities in 47 states. In denying certification,

the Court noted that the plaintiffs did not have any direct evidence of an unlawful policy that applied to all of the proposed class members, but instead asked the Court to infer the existence of such a policy from the fact that a tiny fraction of employees allege that they were not paid for working through meal breaks. The employer presented evidence that a number of the opt-in plaintiffs were themselves paid for meal breaks on occasions when they filed requests to reverse the meal break deductions.

Specifically, the Court found that the reasons why an employee might not have been paid for working through a meal break varied from individual to individual, manager to manager, and facility to facility. Under these highly individualized circumstances, the Court found that the matter should not proceed as a single, nationwide class action.

Similarly, the evidence in this case likewise demonstrates that Plaintiffs have failed to prove that Defendants have an unlawful practice that applies to all proposed class members. For instance, Plaintiffs McClean and Davis admitted during their depositions that an analysis of whether each individual proposed class member was properly compensated for any time worked during their meal break would be a highly individualized inquiry as follows:

> Q. Okay. But those would certainly be a different set of employees that were deviating allegedly from that policy set forth in the manual, correct?
> A. Correct.
> Q. All right. And we would need – in order to determine whether or not any of these employees at the other facilities were shorted any time, we would have to look into the details of each and every one of those shifts that they claim they are shorted, correct?
> A. Agreed.

Doc. 127-6 (McClean deposition) at p.32-33 of 33.

> Q.     Okay. And in order to determine whether or not you got cheated out of some or any portion whatsoever of your meal break, we would have to look at the particulars of that given break; right?
>
> A.     Right.
>
> Q.     Because some breaks you might have gotten cheated out of seven minutes; some breaks you might have gotten cheated out of 15 minutes. Right?
>
> A.     Right.
>
> Q.     It would just vary given on – based upon the particular job duties that you performed on that shift; right?
>
> A.     Right.

Ex. 9 (Davis deposition) at p.33.

Additionally, Plaintiff McClean's actions show that she was aware of the procedures to utilize when she felt that she was not properly compensated for the time that she worked.  For instance, Plaintiff McClean completed a Manual Check Request form on November 10, 2009 which requested to be compensated for two days on which she worked but was apparently not compensated for (likely because she forgot to clock in or clock out on those days).  **Ex. 30**; See also Doc. 127-6 at p.11 of 33.  Plaintiff McClean was paid for these hours once this issue came to light.  *Id*.  Thus, Plaintiff's own actions of manually requesting that she be compensated for hours worked, and Defendant Forsyth Manor, Inc.'s response to this request, are directly contrary to her allegations that Defendants' maintained a policy-to-violate-the policy of compensating employees for all time worked.

Additionally, Defendants have presented evidence from five (5) employees at its Mark Twain Caring Center facility which also indicate that in the relatively rare event that a meal break was missed, that the deduction of thirty (30) minutes was either manually added to their pay records or they were provided with an additional meal break later in their shift.  See Ex. 19 - Ex. 23.

There is also testimony in this case that even different supervisors at an individual facility would handle employee meal breaks differently. For instance, Arthur McKinnon testified that certain supervisors were more strict than others with regard to ensuring that employees receive their full uninterrupted meal breaks as follows:

> Q.  All right. Would those charge nurses kind of handle the break issue differently, like how they scheduled it?
> A.  Well, yes. They had – well, I hate to say it, but some of them would have favoritism with certain ones that would go on breaks and it was okay for them to go on breaks, but instead of going for 30 minutes they would fo for 45 minutes and would cause people that was supposed to be on their breaks to stay on the floor 45 minutes longer, 35 minutes longer, 15 minutes longer, and that was every day.
> Q.  So they would play favorites?
> A.  Oh, yeah.
>     . . . .
> Q.  And then how about Rhonda versus Jackie? Would they handle meal breaks differently?
> A.  Rhonda would. Rhonda was a lot more stricter than those three. She was – she was strict.

Arthur McKinnon depo (Ex. 6) at p.31-32.

The *Saleen* case is hardly the only court to reach this decision. For instance, in *Cason v. Vibra Healthcare*, 2011 WL 1659381 (E.D. Mich. 2011) the plaintiff was a registered nurse who alleged that the Defendant violated the FLSA by failing to pay employees for time worked during their meal breaks. The employer maintained a timekeeping system which automatically deducted 30 for a meal break from the employee's payroll records. As a registered nurse, the plaintiff alleged that she was expected to work through breaks when patient care demanded it, and routinely did so. The employer owned healthcare facilities nationwide, but only seven of those facilities used the automatic deduction policy but these facilities were geographically dispersed over several states. Plaintiff sought certification of a class of all persons subject to the

automatic deduction policy other than those whose employment was governed by a collective bargaining agreement.

In denying conditional certification, the *Cason* court began its analysis by noting that the extremely broad class that plaintiff sought to certify was a factor that weighed against certification. Moreover, the plaintiff admitted that she was not aware of how meal breaks worked for any employees other than those in direct patient care roles at the specific hospital at which she worked. Accordingly, the *Cason* court held that "Plaintiff's own experience at [her specific hospital] does not justify the conditional certification of a collective action against several Vibra facilities nationwide."

Similarly, in *Valcho v. Dallas County Hospital District*, 574 F.Supp.2d 618 (N.D. Tex. 2008) the plaintiff was a nurse whose employer likewise maintained a 30-minute auto deduct meal break policy. The plaintiff alleged that due to short staffing and the nature of nursing work, that she was frequently required to work through all or part of her meal periods even though she was not compensated for doing so. The employer presented evidence that its nurses are required to report any time they spend working through meal breaks to their supervisors (who manually edit the records to ensure proper compensation), and that the nurses are informed of this policy at the new employee orientation.[4] Based upon this evidence, and the absence of contrary evidence submitted by plaintiff, the Court denied conditional certification. See also *Wacker v. Personal Touch Home Care, Inc.*, 2008 WL 4838146 (E.D. Mo. 2008)(denying conditional certification in auto deduct meal policy case)("More importantly, plaintiffs have failed to

---

[4] Defendant Forsyth Manor, Inc. also provided employees with training on the meal break policy during employee orientation. Plaintiff McClean acknowledged receiving training on this policy during her orientation. Doc. 127-6 at p.8 of 33, and Exhibit 5 thereto (attached as **Ex. 31** to this document).

Case 6:11-cv-03037-DGK   Document 139   Filed 08/26/11   Page 20 of 34

provide any competent evidence of a company-wide policy. Where there is no evidence of a company-wide policy, company-wide certification is inappropriate); *Dudley v. Texas Waste Systems, Inc.*, 2005 WL 1140605 (W.D. Tex. 2005)(denying conditional certification in auto deduct meal policy case)("Any analysis of lunch breaks will result in this court and any jury hearing individual testimony regarding whether drivers regularly took lunch breaks, or only occasionally. If they did not take lunch breaks, the fact finder will need to hear the dates each driver actually worked through lunch and whether they needed to be compensated for an extra 30 minutes or one hour for the particular day. Further, the fact finder will need to hear whether any driver advised management that they worked through their lunch break and required compensation.").

For all of the foregoing reasons, conditional certification is inappropriate in this case. However, in the event that the Court feels that some level of conditional certification is appropriate, it should be limited in the following aspects:

    i.    <u>Any conditionally certified class should be limited to employees who were directly involved in resident care activities (i.e. "on the floor") because Plaintiffs' justification for working through meal breaks was due to the necessity to provide resident care</u>

On occasion, Courts have limited conditional certification in auto-deduct meal break cases involving the healthcare industry to employees whose job duties are directly related to patient care. The rationale for limiting conditional certification in this manner is based upon the plaintiffs' asserted reason for being required to work through the meal breaks: i.e. patient care related activities cannot wait until the employees are done with their break and therefore must receive immediate attention.

For instance, in *Hintergerger v. Catholic Health System*, 2009 WL 3464134 (W.D. NY 2009) the plaintiffs worked in health care facilities which maintained a break

deduction policy which automatically deducted a meal break from the pay of hourly workers. Several of the plaintiffs worked directly in patient care related positions. However, at least some of the plaintiffs worked in job capacities that were not directly related to patient care such as dietary aides. The *Hintergerger* court found that the clear implication underlying the plaintiffs' asserted rationale for working through their meal breaks – i.e. that patient care needs are of paramount importance such that they cannot wait until the end of a 30 minute meal period – only supported conditional certification of employees in direct patient care related duties. See also *Colozzi v. St. Joseph's Hospital Health Center*, 595 F.Supp.2d 200 (N.D. NY 2009)(limiting condition in auto deduct case in healthcare facility to employees with direct patient care responsibilities); *Fengler v. Crouse Health Foundation, Inc.*, 595 F.Supp.2d 189 (N.D. NY 2009)(same).

Similarly, Plaintiff McClean also asserts that the reason that she was required to work through her meal breaks was due to patient care activities:

> Q.    All right. Let's start and just tell me as many as you can remember.
> A.    All right. Several [resident] falls, because people were on breaks or there wasn't enough staff, I would have Eileen, who was my Charge Nurse, constantly call me in to either help somebody off the floor or to get somebody up or help her with a treatment or help transfer somebody for somebody else's hall because there was nobody else, and I was on break and the others were busy, so to come back in and help work.
> . . . .
> Q.    So you would be in either the break room or outside during your meal break. At some point in time during that break you would get a page from Eileen saying, we need you for whatever emergency?
> A.    Mm-hmm.
> Q.    You would then report to your nurses' station to complete whatever task that Eileen needed assistance with?
> A.    Mm-hmm.

Doc. 127-6 at p.19-20 of 33.

Several opt-in plaintiffs testified similarly. Indeed, opt-in plaintiffs Jaynie Dennis

and Veronica Alcantar both testified that they had no idea whether employees who were not directly involved in patient care activities had the opportunity to take their full, uninterrupted breaks:

> Q.   All right. Do you have any idea whether or not the housekeeping or dietary employees got to take their meal breaks?
> A.   No.
> Q.   All right. Do you have any idea whether or not the maintenance supervisor got to take his meal breaks?
> A.   No. I know that – that you could see them all outside at different times, but whether it was their meal breaks or smoke breaks or whatever …
> Q.   So would you say your knowledge is limited to the people on the floor, as you say?
> A.   Basically, yes.

Dennis deposition (Ex. 3) at p.33-34.

> Q.   . . . Did you have the opportunity to observe how the meal break worked with regard to the other employees, like the kitchen, housekeeping, office, like those people?
> A.   No.
> Q.   Okay. So you have no idea whether or not those people would actually get their 30-minute break?
> A.   No.

Alcantar deposition (Ex. 5) at p.35.

See also Doc 127-5 in which the opt-in plaintiffs each assert that being called away from their meal breaks was due to being required to "assist residents".

Accordingly, to the extent that a class is conditionally certified then it must be limited to employees whose job duties involve direct resident care such as CNAs, CMTs, shower aides, etc.   Effectively, this would exclude the kitchen, housekeeping, maintenance, and administrative office personnel.

ii.   There is an inherent conflict of interest between Charge Nurses (i.e. the supervisors) and the CNAs/Med Techs/etc. (i.e. the supervised) such that these employees are not similarly situated

The law is well-established that there is inherent conflict in a proposed FLSA "off the clock" collective action which includes both supervisors who are responsible for ensuring that employees receive their full, uninterrupted meal break as well as the employees whom they supervise. Logically, this makes sense. On the one hand, in order for members of the class to demonstrate that they are entitled to overtime compensation for hours worked "off the clock", then, on the other hand, they must necessarily show that their supervisors violated the law (and Defendants' policies) which prohibit such activity. *See*, *e.g.*, *Ellerd v. County of Los Angeles*, 2009 WL 982077 (C.D. Cal. 2009)("The Court concludes that conditional certification of a collective action is not appropriate due to the conflict between the plaintiff social workers and their supervisors.").

Thus, proving an element of some of the class member's case could also mean that other class members would be subject to discipline or discharge for violating the law and company policy. *White v. Osmose, Inc.*, 204 F.Supp.2d 1309, 1315 (M.D. Ala. 2002)("Because the court finds that the job duties of foremen and the crewmen are dissimilar, and that there is an inherent conflict between the two groups, the court concludes that crewmen should be excluded from a conditionally certified class."). *See also Tolentino v. C&J Spec-Rent Services, Inc.*, 716 F.Supp.2d 642, 651 (S.D. Tex. 2010)(supervisor not similarly situated to other plaintiffs).

The deposition testimony of Veronica Alcantar illustrates the inherent tension between Charge Nurses and other supervisors and the employees whom they supervise. Ms. Alacantar worked at the California Care facility from approximately October 2009 –

June 2010. Ex. 5 at p.9-10. Ms. Alacantar is a Licensed Practical Nurse ("LPN") who testified that her job duties encompassed "give medications, document wound care, do medical assessments, supervise the CNAs." Ex. 5 at p.11. In this capacity she supervised the other staff which was "on the floor" (i.e. involved directly in patient care) activities such as the (i) Certified Nurse Aid, (ii) Certified Med Tech, and (iii) Restorative Aide. Ex. 5 at p.16-17. Accordingly, she was considered to be the "Charge Nurse". Ex. 5 at p.12. The Charge Nurse reports directly to the Director of Nursing, which is the highest ranking patient-care employee in each facility. Ex. 5at p.14.

Significantly, the Charge Nurse is responsible for scheduling meal breaks for the employees they supervised. To wit:

> Q.     If I understood you correctly, you're the one that did the chart that scheduled all of the other employees on the floor like the time that they were going to go on their break?
> A.     Yes.

Ex. 5at p.14, 21-22.

Moreover, the Charge Nurse was also responsible for communicating to the employees whom they supervised if they were needed during the break due to particular circumstances arising which required additional assistance, and also for ensuring that the employees ultimately received their full break time:

> Q.     If one of those other employees like, you know, a CMT, an aide, or a restorative aide, if they were on break and something came up, you know, hey, we need you back on the floor, who would communicate that to them? Would that be you?
> A.     It would be me or it would be another aide that neede help or the CMT at times would assist also.
>           . . . .
> Q.     All right. As the charge nurse and the supervisor, was it your responsibility for making sure that the employees you supervised got the meal break?
> A.     Like, we would schedule it. Sometimes it would go later or so or – or if I

would find out that they didn't have a chance to go so the next person had already gone, so –

Ex. 5at p.22-23; 36-37.

Similarly, Kathryn McKinnon worked at the Fulton Nursing & Rehab facility and was initially a housekeeper. Ex. 7at p. 7-8. Thereafter, she became a housekeeping supervisor, and in this capacity she supervised the housekeeping and laundry staff. Ex. 7at p. 8. Again, as a supervisor, Ms. McKinnon was the employee responsible for ensuring that the employees whom she supervised received their full meal breaks:

> Q. All right. As the housekeeping supervisor, was it your responsibility to schedule the housekeepers for their --
> A. Yes.
> Q. -- for their breaks?
> A. Yes.
> . . . .
> Q. Okay. And of course, it was your job responsibility to make sure the housekeepers took their breaks; right?
> A. Yes.
> Q. All right. And you would always make sure they got a break?
> A. Yes.
> Q. A hundred percent of the time?
> A. Just about, yeah.

Ex. 7 at p.18-20.

Accordingly, at a minimum, the scope of Plaintiffs' proposed class needs to be narrowed to limit its scope to remove Charge Nurses, Housekeeping Supervisors and any and all other employees who were responsible for scheduling and ensuring that the employees whom they supervised took a full, uninterrupted meal break.

iii. <u>The unionized facilities that Defendant Health Systems, Inc. manages must be excluded from the scope of the proposed class because the terms and conditions of their employment are governed by separate collective bargaining agreements</u>

Three of the facilities that Defendant Health Systems, Inc. presently manages are unionized. Doc. 127-3 at p.32 of 35. Of course, the employees at these facilities have selected the union as the exclusive bargaining representative regarding the terms and conditions of their employment.

In the event that employees at these facilities believe that they have been underpaid, then they have the ability to use a shop steward and/or a union business representative to assist them in the grievance and arbitration process. Accordingly, employees at these facilities are not similarly situated to the employees at non-unionized facilities.

Indeed, it is relatively common for requests for conditional certification to expressly exclude unionized facilities *See*, *e.g.*, *Cason v. Vibra Healthcare*, 2011 WL 1659381 (E.D. Mich. 2011)(seeking to certify a class consisting of "All persons employed within the three years preceding the filing of this action, on a non-exempt, hourly basis, whose pay was subject to an automatic 30 minute meal period deduction, and *whose employment with Defendants was not governed by a collective bargaining agreement*.")(emphasis added).

3. <u>Defendant's time clock rounding policy</u>

Plaintiffs correctly note that all facilities that Health Systems, Inc. utilize the same timekeeping system which is known as Insperity f/k/a Timestar. D. Atkin depo. (Ex. 2) at p.25. Plaintiffs are also correct that the Insperity software utilizes a rounding system commonly known as a "7/8 split" (i.e. it will round down to the previous quarter hour in the event that less than seven minutes have passed since the previous quarter hour, but will round up to the next quarter hour in the event that eight or more minutes have passed).

For example, in the event that an employee clocks in at 6:55 a.m then the Insperity system will automatically round the time to 7:00 a.m. (and therefore the employee will not be paid for five (5) minutes when he or she was not working). However, the flip side of the coin is also true – i.e. if the employee clocks out at 2:55 p.m. then the Insperity system will automatically round the time to 3:00 (and therefore the employee will be paid for 5-minutes when he or she was not actually working).

Again, there is nothing inherently sinister about utilizing this timekeeping method. Indeed, the United States Department of Labor has issued a regulation which explicitly approves of this practice assuming that the rounding averages out so that the employees are compensated for all time that they work. 29 C.F.R. § 785.48(b).

Plaintiffs' problem, however, is a failure of proof. Plaintiffs rely upon Defendant's response to Defendant's Interrogatories and excerpts from the deposition of B. Scott Hinkle[5] to merely establish that the rounding practice exists. Defendants do not dispute this fact, but these documents do not establish, or even reference, how the

_____

[5] Note that Plaintiffs failed to elicit testimony from Mr. Hinkle as to whether the rounding practice worked to the collective detriment of Plaintiffs McClean and Davis.

rounding practice actually worked vis-à-vis the class members.

Thus, the only materials offered to support Plaintiffs' theory that the rounding practice operates, over time, to the detriment of the class members are Exhibits 8-9 to their Motion for Conditional Certification. See Doc. 127-7 and 127-8. However, Plaintiffs completely fail to (i) offer any foundation testimony for these exhibits, (ii) attempt to authenticate these documents, or (iii) explain how they came to the unfounded conclusion that these documents stand for the proposition that the rounding practice worked to the detriment of Plaintiffs McClean and Davis. Simply put, these documents lack any evidentiary value due to their failure to comport with the Federal Rules of Evidence, and therefore cannot be used as support for their request for conditional certification. *Jost v. Commonwealth Land Title Ins. Co.*, 2009 WL 211943 at * 3 (E.D. Mo. 2009)(citing cases for the proposition that evidence submitted in support of conditional certification are subject to similar evidentiary standards as those submitted for summary judgment). *See also Landsberg v. Action Enterprises, Inc.*, 2006 WL 3742221 (S.D. Ohio 2006)(denying conditional certification when materials offered in support of same were inadmissible).

The only other shred of evidence that Plaintiffs can point to in support of their request for conditional certification on this issue is a provision in the Personnel Policies and Procedures Manual which prohibits an employee from clocking in more than seven (7) minutes before their scheduled start time, or from clocking out more than seven minutes after their scheduled end time. Doc. 127-4 at p.19 of 40. It appears that, on this issue at least, Plaintiffs seek to hold Defendants to a strict application of the handbook policy. Contrast this theory with Plaintiffs' "policy-to-violate-the-policy" theory with

regard to missed meal breaks. Plaintiffs offer no evidence whatsoever as to whether this policy is actually followed, and in any event, strict application of this policy would not necessarily prevent the time records from evening out over time where an employee clocks out less than seven (7) minutes before the end of their shift (as set forth in the example *supra*).

Lastly, Plaintiffs fail to offer any evidence whatsoever how the rounding practice operated in practice with regard to any of the opt-in plaintiffs, or at any facility other than the one where the named plaintiffs worked (i.e. Forsyth Manor).

Although the Declarations submitted in support of the Motion for Conditional Certification contained the statement "[d]uring my employment at this Health Systems, Inc. managed facility, I began working no later than immediately following clocking in for my shift. At the end of my shift, I worked at least up until the moment I clocked out" it likewise does not offer any evidentiary support because it does not establish how the rounding practice actually worked *as applied to each plaintiff*. See Doc. 126-5 at ¶ 12. It is entirely possible that the plaintiff clocked in 8-minutes before the beginning of the shift (which means that their time would be rounded back to the prior quarter hour mark and they would benefit from the rounding practice), and then clocked out seven minutes early (which means that their time would be rounded up to the quarter hour mark and they would benefit from the rounding practice). We simply do not know whether or not this is the case because Plaintiffs have failed to provide appropriate evidentiary support on this issue.

Based upon this dearth of evidentiary support, Plaintiffs have failed to meet even a "two-step" evidentiary hurdle on the rounding practice issue. *Commonwealth*, 2009

WL 211943 at *2 ("While the burden on the plaintiff is relatively low at this initial stage, is it not invisible . . . unsupported assertions that FLSA violations were widespread and that additional plaintiffs exist do not meet this burden").

        4.     <u>Defendant's retro pay bonus</u>

Again, Plaintiffs suffer from a failure of proof on this issue. Plaintiff's Motion for Conditional Certification on this issue relies upon (i) excerpts from the deposition of B. Scott Hinkle, (ii) a Memorandum from Tom Hudspeth dated 11/16/2009 [Doc. 127-10], and (iii) a Memorandum from Tom Hudspeth dated 11/12/2010 [Doc. 127-11].

A cursory review of the cited portions of Mr. Hinkle's deposition reveals that he lacks personal knowledge about the two Memorandums (which is not surprising given that Mr. Hudspeth – whom Plaintiffs did not depose – was the purported author of these documents). When Plaintiffs began questioning Mr. Hinkle regarding the contents of these exhibits, it became readily apparent that he lacked personal knowledge such that he was unable to authenticate the documents:

> Q.     Who's "we"?
> A.     I would – again, I do not know. Tom Hudspeth drafted this. You would have to ask him particularly.
>       . . . .
> Q.     Whose valuable employees?
> A.     Again, Tom Hudspeth drafted this. I'm assuming you'd have to speak with him on the details of what he intended, what his intent was in that specifically.

Doc. 127-3 at p.20 of 35.

Furthermore, Plaintiffs cite to Mr. Hinkle's deposition testimony for the proposition that "HSI decides not to include the bonus in the regular rates of pay, and HSI applies this decision uniformly to all employees at its facilities." Doc 127 at p.6 of

31

16.[6]  Again, a cursory review of the cited portion of the record reveals that it does <u>not</u> support this proposition.  To the contrary, Mr. Hinkle expressly disclaims any knowledge as to this particular topic:

> Q.  Do you want to – are you prepared to acknowledge that retro pay is not incorporated into employees' regular rate of pay for purposes of calculating overtime?
>
> A.  Again, I can't answer that. That would be Diana Adkin[], as to whether it was calculated in there. What I can tell you is that what the intent was and what it is, is it's a bonus calculation.

Doc. 127-3 at p.25 of 35.

Moreover, note that Plaintiffs' Declarations contain nothing whatsoever regarding their allegations regarding the retro bonus.  For instance, we do not know whether any of the Plaintiffs even worked overtime during any workweek.  Of course, the FLSA only applies to claims for unpaid minimum wages and/or overtime.  29 U.S.C. § 216(b)("Any employer who violates the provisions of section 207 or section 207 of this title shall be liable to the employee or employees affected *in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be*, and in an additional equal amount as liquidated damages.")(emphasis added).  In the event that they did <u>not</u> work in excess of forty (40) hours per workweek, then the issue of whether or not the retro bonus was included in their regular rate would be moot because they would not be entitled to time and a half their hourly rate of pay.   Again, Plaintiffs suffer from a failure of proof and the Court is left with nothing more than speculation and conjecture as to whether Plaintiffs and the opt-ins worked more than forty (40) hours in any particular workweek.

---

[6] Defendants, of course, take the position that the retro pay bonus qualifies as a discretionary bonus which is not included in the regular rate of pay used to calculate the overtime premium.  29 C.F.R. § 778.211.

Accordingly, Plaintiffs have failed to satisfy their burden to come forward with sufficient admissible evidence that Defendants have a common practice of depriving its employees of overtime compensation, and whether any of the plaintiffs worked overtime hours, based upon the failure to include the retro bonus in their regular rate of pay.

WHEREFORE, Defendant Health Systems, Inc. and Defendant Forsyth Manor, Inc. respectfully request the Court to deny Plaintiffs' Motion for Conditional Certification in its entirety, and for such other and further relief and the Court deems just and proper.

Respectfully submitted,

McCARTHY, LEONARD, KAEMMERER, L.C.


By:    /s/ Bryan M. Kaemmerer
          Michael E. Kaemmerer, #25652MO
          Brian E. McGovern, #34677MO
          Kristen L. Maly, #40514MO
          Bryan M. Kaemmerer, #52998MO
          400 South Woods Mill Road, Suite 250
          Chesterfield (St. Louis), MO 63017-3481
          (314) 392-5200
          (314) 392-5221 (Fax)
          mkaemmerer@mlklaw.com
          bmcgovern@mlklaw.com
          bkaemmerer@mlklaw.com
          kmaly@mlklaw.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 26th day of August 2011, the foregoing was filed electronically with the Clerk of Court, therefore to be served electronically by operation of the Court's electronic filing system upon the following:

Rowdy B. Meeks, Esq.
Tracey F. George, Esq.
Rowdy Meeks Legal Group LLC
4717 Grand Ave., Ste. 840
Kansas City, Missouri 64112
Rowdy.Meeks@rmlegalgroup.com
Tracey.George@rmlegalgroup.com
Attorney for Plaintiffs

/s/ Bryan M. Kaemmerer